# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Jorge Daniel Jimenéz Blancarte,

              Petitioner,

v.

Luna Elizabeth Ponce Santamaria,

              Respondent.

_____/

Case No. 19-13189

Judith E. Levy
United States District Judge

Mag. Judge David R. Grand

## OPINION AND ORDER GRANTING PETITIONER'S COMPLAINT FOR IMMEDIATE RETURN OF CHILDREN PER HAGUE CONVENTION [1]

This is an international child abduction case brought under the Hague Convention and its implementing statutes, the International Child Abduction Remedies Act (ICARA). 42 U.S.C. §§ 11601-11611. Petitioner alleges that in January 2019, Respondent wrongfully removed Petitioner and Respondent's two daughters, now ages 9 and 10, from Mexico to the United States. Both the United States and Mexico are signatories to the Hague Convention. On October 30, 2019, Petitioner filed this Complaint for Immediate Return of Children Per Hague Convention. (ECF No. 1.) Because Petitioner has demonstrated a prima

facie case for wrongful removal under the Hague Convention and Respondent has not successfully pled any affirmative defense, the Court grants Petitioner's complaint and orders that the two children be returned to Mexico.

## I. Background

Prior to January 2019, Petitioner and Respondent lived in Mexico with their two minor children. (ECF No. 1). Respondent describes their living situation as fraught with conflict, anger, and violence. (ECF No. 18, PageID.98-100.) In January 2019, Respondent took the parties' two minor children and moved to Michigan. (ECF No. 1, PageID.2.)

After locating the children in Michigan, Petitioner filed an initial complaint in this Court on July 12, 2019. *Blancarte v. Santamaria*, Case No. 19-12078 (E.D. Mich. July 12, 2019). On October 29, 2019, Judge Tarnow dismissed the case without prejudice for failure to serve Respondent. *Id.* (ECF No. 4.) On October 30, 2019, Petitioner filed a second complaint for the immediate return of the two children to Mexico pursuant to the Hague Convention and its implementing statutes. (ECF No. 1.) Petitioner, alleging that Respondent and the two children were flight risks, requested emergency injunctive relief. (ECF No. 2.) Finding

both a risk of flight and that such flight would constitute irreparable injury, the Court entered an *ex parte* temporary restraining order, first on November 1, 2019 (ECF No. 5), and, after repeated failed attempts to locate Respondent or the children, again on November 4 (ECF No. 6), November 5 (ECF No. 10), and November 6. (ECF No. 11.) The Court granted Petitioner temporary custody of the children and appointed a Guardian Ad Litem. (ECF No. 10.) After locating the children on November 7, 2019, the U.S. Marshals Service and the Guardian Ad Litem facilitated the transfer of the children's custody from Respondent to Petitioner. On November 12, 2019, the parties filed a Stipulation for Interim Parenting Time (ECF No. 16), which the Court granted in part. (ECF No. 17.) Respondent also raised three affirmative defenses to Petitioner's complaint. (ECF No. 18.)

After a hearing on November 13, 2019, the Court converted its temporary restraining order into a preliminary injunction. (ECF No. 19.) On November 25, 2019, the Court held an evidentiary hearing on Respondent's affirmative defenses. The Court heard testimony from Respondent, Respondent's adult son Carlos, and Petitioner. On November 26, 2019, the Court heard testimony from the parties' older

daughter. After the hearing, the Parties agreed to attempt mediation. Mediation was unsuccessful. (ECF No. 25, PageID.189.) The Court now rules on the merits of Petitioner's complaint.

## II. Legal Standard

"The Hague Convention is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996). The Hague Convention mandates that this Court only determine the merits of the abduction claim and not the merits of any custody dispute. *See March v. Levine*, 249 F.3d 462, 472 (6th Cir. 2001).

Under Article 3 of the Hague Convention, removal of a child is wrongful (and return required) where:

a) It is in breach of the rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal of retention; and

b) At the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention on the Civil Aspects of International Child Abduction, Article 3, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 ("Hague

Convention"). A prima facie case of wrongful removal thus has three elements: 1) prior to removal or wrongful retention, the child was habitually resident in a foreign country; 2) the removal or retention was in breach of custody rights under the foreign country's law; and 3) the petitioner was exercising custody rights at the time of the removal or wrongful retention. 42 U.S.C. § 11603(e) provides the petitioner must successfully prove a prima facie case by the preponderance of the evidence. Once a petitioner has met their burden, a court shall order return of the child to their home country unless a respondent can show one of five enumerated affirmative defenses.

### III. Analysis

Respondent does not contest any element of Petitioner's prima facie case. Petitioner has met his burden.

#### A. Prima Facie Case

Petitioner has demonstrated that the children's habitual residence was Mexico, Respondent's removal of the children interfered with his custody rights, and he was actively exercising those rights at the time of removal.

#### 1. Habitual residence

For the Hague Convention to apply, the abducted child must have been "habitually resident in a Contracting State immediately before any breach of custody or access rights." Hague Convention, Article 4. The Sixth Circuit defines "habitual residence" as the "place where a person customarily lives." *Taglieri v. Monasky*, 907 F.3d 404, 407 (6th Cir. 2017). A district court may look to the place in which the child has become "acclimatized." *Id.* (citing *Ahmed v. Ahmed*, 867 F.3d 682 (6th Cir. 2017)). In *Robert v. Tesson*, the Sixth Circuit emphasized that habitual residence analysis should focus on a child's past experiences and not the parents' future intentions. 507 F.3d 981 (6th Cir. 2007).

Prior to removal, both daughters had lived their entire lives in Mexico. (Evidentiary Hearing, Nov. 25, 2019.) They attended school in Mexico. (*Id.*) The family lived together in Mexico. (*Id.*) There is no evidence that the children had ties to any other country. Petitioner has demonstrated, and Respondent concedes, that the children's habitual residence was Mexico.

### 2. Wrongful Removal

Article 3 of the Hague Convention defines wrongful removal as removal that is in breach of custody rights under the law of the country

in which the child was habitually resident. Rights of custody are defined in Article 5(a) as "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, Article 5(a).

Here, Petitioner has provided the Court with Mexico's Civil Code for the Federal District relating to parentage and divorce. (ECF No. 1, PageID.39.) Article 414 provides that the "patria potestas" (power of a father) over children is exercised by the parents. (*Id.* at PageID.40.) This power continues even if the parents separate. (*Id.*) (Article 416). Children have a right to interact with both parents. (*Id.*) (Article 416 Bis.) The patria potestas allows a person to determine the domicile of their children. (*Id.*) (Articles 411, 421.) Petitioner has provided the children's birth certificates, which show that he is the lawful father. (ECF No. 1, PageID.26–29.) Under these laws, Petitioner had custody rights under the laws of Mexico; Respondent's removal of the children to Michigan breached those rights by depriving Petitioner of his rights to interact with his children and determine their domicile.

### 3. Exercising Rights

The Hague Convention does not define "exercise." In *Friedrich v. Friedrich*, the Sixth Circuit held that a parent exercises their rights "whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with [their] child." 78 F.3d 1060, 1065 (6th Cir. 1996). A parent cannot fail to exercise custody rights "short of acts that constitute clear and unequivocal abandonment of the child." *Id.* at 1066.

Petitioner easily satisfies the third prong. Prior to January 2019, he lived with the children and regularly took them to school. (Evidentiary Hearing, Nov. 25, 2019.) In addition, he has actively sought to reunite with them since January 2019. He filed a complaint with the Mexican Secretary of External Relations on March 30, 2019. (ECF No. 1, PageID.7.) Petitioner also traveled to Michigan to find them, (Evidentiary Hearing, Nov. 25, 2019), and he has filed two complaints in federal district court seeking their return. (ECF No. 1; *Blancarte v. Santamaria*, Case No. 19-12078 (E.D. Mich. July 12, 2019).)

Petitioner has made out a prima facie case for wrongful removal under the Hague Convention. Barring an affirmative defense, the Court must order the children returned to Mexico.

## B. Affirmative Defenses

Respondent has raised three affirmative defenses under the Hague Convention: there is a grave risk of harm to the children if they are ordered to return to Mexico, the children have acclimated to living in Michigan, and they object to being returned to Mexico. (ECF No. 21, PageID.173.) Respondent has not met her evidentiary burden with respect to her first and third defenses. Respondent's second defense fails as a matter of law.

### 1. Grave risk of harm

Article 13(b) of the Hague Convention provides that a court may decline to order the return of a child if there is a "grave risk that [their] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." 42 U.S.C. § 11603(e)(2)(A) provides that this defense must be shown by clear and convincing evidence.

Respondent makes the following allegations related to abuse:

- The children have witnessed Petitioner act violently toward their stepbrother. (ECF No. 18, PageID.99.)
- Petitioner forcibly shaved Respondent's son's head, physically abused him, and forced him out of the marital home. (ECF No. 18, PageID.100.)

- Petitioner refused to feed the two minor children when Respondent was traveling for business. *Id.*
- Petitioner violently and aggressively brushed their oldest daughter's mouth, using soap as toothpaste, as he forcibly undertook this act with her toothbrush. *Id.*
- Petitioner physically and sexually abused Respondent. She alleges there is a restraining order issued in Mexico preventing Petitioner from approaching or being in the presence of the Respondent or their daughters. (ECF No. 18, PageID.102.)

In Respondent's initial filings, she also included psychological reports of the two children from October 14, 2019. The reports, prepared by a Mexican provider following video teleconferencing appointments with the children, conclude that they each suffer from "posttraumatic stress disorder, depression, anxiety, and general fear, caused by living in an environment with the paternal figure that was as psychologically violent as it was physically." (ECF No. 18-5, PageID.135, 139.)

Petitioner argues that Respondent's allegations of abuse are fictitious. *Id.* He contests the reliability of an over-the-phone psychological report. *Id.*

At the Court's November 25 and 26, 2019 evidentiary hearing, testimony confirmed Respondent's allegations to varying degrees. The Court finds Respondent's allegations of Petitioner's violence towards her

credible and concerning. Testimony regarding the alleged violence towards Respondent's son revealed that Petitioner did not forcibly shave his head, but instead took Respondent's son to a barber to have his head shaved in connection with requirements for participation on a sports team. However, testimony shows that Petitioner physically assaulted Respondent's son, forced him to stay in a shower against his will, and banished him from the parties' home.

As Respondent concedes, however, "the minor children have not been physically assaulted" (ECF No. 21, PageID.175.), nor have the daughters directly witnessed the physical abuse of their brother or mother. Testimony from the parties' oldest daughter revealed that on one occasion, Petitioner poked her tongue with a toothbrush. The Court heard no evidence relating to food deprivation. Respondent did not provide the Court with a copy of the alleged restraining order.

These factual conclusions are further confirmed by the Guardian Ad Litem's report, submitted to the Court on November 13, 2019. (ECF No. 20.) The Guardian Ad Litem spoke with the two children individually and together. Both parties agree that the two children trust the Guardian Ad Litem.

The Guardian Ad Litem reported the following from her conversation with the oldest daughter:

> When asked whether she was afraid of her father, she said that he could be angry. When asked whether her father had ever had any physical contact with her, she denied that he grabbed, hit, or made any physical contact with her. [She] stated that Petitioner would sometime[s] raise his hand at her but did not make contact with her. When asked whether Petitioner hit or hurt anyone, she said "yes, my mom." When asked whether she had personally observed any such conduct, she stated no. When asked how she became aware of father's conduct toward her mother, she stated "because my mom told me."

(ECF No. 20, PageID.164-65.) The Guardian Ad Litem further explained that "[a]t no[] time did either child indicate physical harm or fear of physical harm by Petitioner." (ECF No. 20, PageID.165.)

Respondent presented no evidence beyond the initial mental health reports of any psychological harm to the children. Respondent did not call as a witness the psychologists who performed the evaluation; nor did she call any other mental health expert.

In *Friedrich v. Friedrich*, the Sixth Circuit noted that a grave risk of harm could exist in only two situations:

> First, . . . when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute—e.g.,

returning the child to a zone of war, famine, or disease. Second, . . . in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

78 F.3d 1060, 1069 (6th Cir. 1996).

The first *Friedrich* situation does not apply. The children's residence in Mexico is "in a lovely, family-friendly neighborhood." (ECF No. 22, PageID.182.) The children "attend school, play and do activities." (*Id.*) "Their neighborhood is nowhere near the 'warzone' or 'place of famine' the *Friedrich* court contemplates." *Id.* Respondent does not contest this characterization.

Respondent has not provided evidence sufficient to satisfy the second *Friedrich* situation. In *Simcox v. Simcox*, the Sixth Circuit analyzed when abuse could rise to the level of a grave risk of harm. 511 F.3d 594 (6th Cir. 2007). The court emphasized that grave risk of harm analysis focuses on "the time period between repatriation and the determination of custody by the courts in the child's homeland." *Id.* at 607. The court separated abuse cases into three categories:

First, there are cases in which the abuse is relatively minor. In such cases it is unlikely that the risk of harm caused by return of the child will rise to the level of a 'grave risk' or

otherwise place the child in an 'intolerable situation' . . . . In these cases, undertakings designed to protect the child are largely irrelevant; since the Article 13b threshold has not been met, the court has no discretion to refuse to order return, with or without undertakings. Second, at the other end of the spectrum, there are cases in which the risk of harm is clearly grave, such as whether there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect. . . . In these cases, undertakings will likely be insufficient to ameliorate the risk of harm, given the difficulty of enforcement and the likelihood that a serially abusive petitioner will not be deterred by a foreign court's orders. . . . Third, there are those cases that fall somewhere in the middle, where abuse is substantially more than minor, but is less obviously intolerable. Whether, in these cases, the return of the child would subject it to a 'grave risk' of harm or otherwise place it in an 'intolerable situation' is a fact-intensive inquiry that depends on careful consideration of several factors, including the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return. Even in this middle category, undertakings should be adopted only where the court satisfies itself that the parties are likely to be particularly appropriate.

*Id.* at 607-08.

The *Simcox* court found the facts in that case to fall in the third, middle category. There, the father beat the children physically and abused the children's mother in their presence. *Id.* at 609. A psychologist found that the children suffered from Post-Traumatic Stress Disorder.

*Id.* The court emphasized that the Hague Convention "was never intended to be used as a vehicle to return children to abusive situations. . . [T]he Convention's mandate of return 'gives way before the primary interest of any person in not being exposed to physical or psychological danger." *Id.* Ultimately, the court found that "we cannot say, however, that the risk here is so grave that undertakings must be dismissed out-of-hand." *Id.* It remanded the case to the district court to determine what conditions could mitigate the grave risk of harm. *Id.* at 610.

The Court finds the abuse in this case to fall into *Simcox'* first, "minor" category. The evidence, although serious, presents significantly less risk of harm to the children than did the evidence in *Simcox.* There, the children experienced direct physical abuse and witnessed the abuse of their mother. 511 F.3d at 609. The court called the application of the grave risk defense to those facts "a close question." *Id.* Its determination relied on the serious nature of the abuse, its "extreme frequency," the reasonable likelihood it would continue, and the likely exacerbation of the children's PTSD upon return. *Id.* at 608-09.

Here, Petitioner has not physically abused his children, nor have the children directly witnessed abuse of their mother or brother.

Moreover, testimony portrays the abuse as discrete incidents over a period of years. While Petitioner's history of angry outbursts and violence towards Respondent and his stepson is concerning, it is not enough to show a grave risk of harm to the parties' minor children. *See Whallon v. Lynn*, 230 F.3d 450, 460 (1st Cir. 2000) (physical abuse of spouse, when not also directed at child, insufficient to trigger grave risk exception in absence of allegations of physical or psychological abuse toward child); *Aly v. Aden*, No. 12–1960, 2013 WL 593420, at *17–18 (D. Minn. Feb. 14, 2013) (four minor instances of domestic violence against spouse, only one of which was witnessed by child, insufficient to establish grave risk of harm); *Fernandez v. Bailey*, 2010 WL 3522134, at *2–3 (E.D. Mo. Sept. 1, 2010) (emotional, psychological, and physical abuse of spouse insufficient to establish grave risk when petitioner was not violent, abusive, or neglectful to the children). The Court is saddened to learn of any degree of abuse, and does not doubt that to the extent the children were aware of it, there is lasting harm. But Respondent has not provided, and the Court could not find, any caselaw suggesting that under the facts in this case, a grave risk of harm can be established.

Moreover, beyond a passing mention at the Court's November 13, 2019 hearing of Petitioner's ability to "purchase" courts in Mexico, Respondent has not argued that Mexican courts are "incapable or unwilling to give the child[ren] adequate protection." 78 F.3d 1069.

Respondent has not met her burden of showing a grave risk of harm by clear and convincing evidence.

## 2. Acclimation

Respondent's second affirmative defense fails as a matter of law. Article 12 of the Hague Convention provides that if a proceeding is commenced more than one year after the removal of a child and the child has become settled in their new environment, a court need not order the child's return. *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996). A respondent must establish this defense by a preponderance of the evidence. 42 U.S.C. §11603(e)(2)(B).

In this case, Petitioner alleges that Respondent abducted their daughters in January 2019. Respondent does not contest this. Petitioner filed this case on October 30, 2019. Respondent concedes that the children had then resided in Michigan for ten months. (ECF No. 21, PageID.176.)

Therefore, these proceedings commenced less than one year after removal, and the defense does not apply.

### 3. Children's Objections

Article 13 of the Hague Convention provides that a court may consider a child's objection to returning if the child "has attained an age and degree of maturity at which it is appropriate to take account of [their] views." 42 U.S.C. § 11603(e)(2)(B) provides that Respondent must show the children's objection by a preponderance of the evidence. A child's objection is different from a child's wishes, as would be considered in a custody hearing. *Neumann v. Neumann*, 310 F.Supp.3d 823, 835 (E.D. Mich. 2018). An objection may require a child to set forth particularized reasons why they object as opposed to a mere general opposition to return. *Yang v. Tsui*, 499 F.3d 259, 279 (3d Cir. 2007). This Court has previously considered the objections of children as young as eight. *See Raijmakers-Eghaghe v. Haro*, 131 F. Supp. 2d 953, 957-58 (E.D. Mich. 2001) (finding that Hague Convention imposes no age limit on defense and eight-year old's views may be considered).

Respondent argues that "the children are old enough and have a sufficient degree of maturity to express any objection they have to being

returned to the Petition[er] or to be removed from the country." (ECF No. 18, PageID.102.) The Court heard testimony in chambers, and on the record, from the parties' older daughter on November 26, 2019, after which the Court determined that she had the level of maturity required to understand the proceedings and to provide meaningful testimony.

The older daughter testified that she preferred her life in Michigan to her life in Mexico. (Evidentiary Hearing, Nov. 26, 2019.) She described having better and nicer friends in Michigan. (*Id.*) She explained that she liked attending school in Michigan more than in Mexico because her classmates in Mexico would make fun of her for wearing glasses. (*Id.*) She said that her father was often angry, and she would prefer to live with her mother. (*Id.*) When asked where she would prefer to live, she said she would prefer to live in Michigan because she feels she will be "more successful" here than in Mexico. (*Id.*)

The child's testimony does not rise to the level of objection required. Her opinions about her school, friends, parents, and future success all demonstrate a preference of a ten-year-old child for staying one place over another; however, a comparative preference of this nature lacks the particularity required to satisfy the narrow affirmative defense under

Article 13. The Court finds the child's testimony to be more akin to a child's wishes that could play a role in a custody hearing, *Neumann v. Neumann*, 310 F.Supp.3d at 835, than the particularized objections required under the Hague Convention, *Yang v. Tsui*, 499 F.3d at 279. *See, e.g., Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 206 (E.D.N.Y. 2010) (finding an articulation of a comparative preference for climate, education, and recreational activities insufficient to invoke affirmative defense).

Because Petitioner has met his prima facie case and Respondent has not shown an affirmative defense, the Court will order the children's return to Mexico. However, in order to minimize any harm and disruption that might result, the Court will do so with undertakings.

## C. Conditions of Return

Although Respondent has not shown a grave risk of harm, the Court may nonetheless order a return with undertakings to limit any possible harm that such a return could cause to the children. *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995) ("in order to ameliorate any short-term harm to the child, courts in the appropriate circumstances have made return contingent upon 'undertakings'"); *see also Kufner v. Kufner*,

519 F.3d 33, 41 (1st Cir. 2008) (upholding undertakings requiring dismissal of criminal charges against respondent, medical care for children, and reasonable access and visitation for noncustodial parent).

Given the history of domestic violence by Petitioner against Respondent, the Court finds conditions necessary to ensure a safe and stable return to Mexico for the two children. The parties and their counsel are ordered to meet with the Guardian Ad Litem to facilitate a return plan and submit a stipulated plan to the Court no later than January 13, 2020. Should the parties be unable to reach an agreement with respect to a proposed return plan, each party and the Guardian Ad Litem are ordered to submit proposed return plans to the Court no later than January 13, 2020. Any proposed return plan must provide for the children's return to Mexico no later than January 31, 2020. The parties are ordered to provide psychological counseling for the daughters to deal with their removal to Michigan and their return to Mexico. *See Jaet v. Siso*, No. 08-81232, 2009 WL 35270 at *9 (S.D. Fla. Jan. 5, 2009) (ordering the same).

### D. Fees

Petitioner moves in his closing brief for costs and fees. (ECF No. 25, PageID.194.) Section 11607(b)(3) of the International Child Abduction Remedies Act requires any court ordering the return of a child under the Convention to award fees and costs to the petitioner unless the respondent establishes that such order would be "clearly inappropriate". 42 U.S.C. § 11607(b)(3). As the Eleventh Circuit recently explained, the "clearly inappropriate" standard involves fact-dependent inquiry. *Rath v. Marcoski*. 898 F.3d 1306, 1311 (11th Cir. 2018). The Court will order briefing on this issue.

### IV. Conclusion

It is hereby ordered that Petitioner's complaint for return of minor children is **GRANTED.**

It is **ORDERED** that the parties and their counsel meet with the Guardian Ad Litem to facilitate a return plan and submit such a plan to the Court no later than January 13, 2020. Petitioner may appear at the meeting via phone or videoconference.

If the parties are unable to reach an agreement with respect to a proposed return plan, the parties and the Guardian Ad Litem are

**ORDERED** to file proposed return plans to the Court no later than January 13, 2020.

Any proposed return plan must provide for the children's return to Mexico no later than January 31, 2020.

Should Respondent return to Mexico, the parties are **ORDERED** to abide by the terms of the Order for Interim Parenting Time unless and until a Mexican court issues a custody ruling or determination.

The parties are **ORDERED** to provide psychological counseling for both children upon their return to Mexico.

The parties are **ORDERED** to pay any remaining or future Guardian ad Litem fees pursuant to the Court's November 6, 2019 Order. (ECF No. 11.)

Respondent is **ORDERED** to either stipulate to the costs and fees proposed by Petitioner or to provide, in writing of no more than 10 pages no later than January 17, 2020, argument why such costs and fees should not be awarded to Petitioner. Petitioner may respond, in writing of no more than 10 pages, by no later than January 24, 2020.

IT IS SO ORDERED.

Dated: January 3, 2020        s/Judith E. Levy
Ann Arbor, Michigan        JUDITH E. LEVY

United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record and/or pro se parties on this date, January 3, 2020, using the Electronic Court Filing system and/or first-class U.S. mail.

s/William Barkholz
Case Manager